# UNITED STATES DISTRICT COURT
## OF THE EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | | |
|---|---|---|
| **FRANK CHAPMAN, INDIVIDUALLY** | § | |
| **AND ON BEHALF OF THE ESTATE OF** | § | |
| **JONATHAN CHAPMAN, DECEASED** | § | |
| | § | |
| | § | |
| **VS.** | § | **CAUSE NO. _____** |
| | § | **JURY TRIAL DEMANDED** |
| | § | |
| **JENNIE WEISINGER and** | § | |
| **BURKE CENTER** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff files this original complaint, and would respectfully show the Court as follows:

### I. Nature of Suit

1.      Frank Chapman, individually and on behalf of the estate of his son, Jonathan Chapman, deceased, brings suit under 42 U.S.C. §1983 for the deprivation of Jonathan Chapman's constitutional rights. Mr. Chapman, a resident of the Burke Center that had been left in a reclined chair in a secluded room, was vomiting for hours. For hours, Ms. Weisinger, a Burke Center employee, refused Mr. Chapman's repeated requests for help and to go to the hospital, and abandoned him to die. Mr. Chapman died from aspirating his own vomit. Mr. Chapman was deprived of his constitutional rights to reasonably safe conditions, to be free from undue restraint, to adequate medical care, and to protection from harm. Mr. Chapman's death was needless and could have been easily prevented had his basic constitutional rights been respected.

## II. Parties

2.      Plaintiff, Frank Chapman, individually and on behalf of Jonathan Chapman, is the biological father of Jonathan Chapman, deceased, and is a citizen and resident of Houston County, Texas.

3.      Defendant, JENNIE WEISINGER, was and is an employee of the Burke Center and may be personally served with process at her last known address at 1049 Phillips Rd., Huntington, Tx 75949, or wherever she may be found.

4.      Defendant, BURKE CENTER, is a community center that provides mental health services and residential services in certain counties in East Texas. Defendant may be served with process by serving its Chief Executive Officer, Melanie Taylor, at 2001 South Medford Dr., Lufkin, Tx 75901. It has its principal place of business in Angelina County.

## III. Jurisdiction and Venue

5.      The court has jurisdiction over this lawsuit because this suit involves a federal question as Plaintiff's claims include a claim arising under 42 U.S.C. § 1983. Therefore, this Court has jurisdiction under 28 U.S.C. § 1331.

6.      Further, venue is proper in the Lufkin division of the Eastern District of Texas in that all or a significant portion of plaintiff's claims and/or causes of action accrued in the Eastern District of Texas pursuant to 28 U.S.C. §1391(b) (1) and (2). Specifically, this incident occurred in Angelina County, Texas.

### IV. Facts

7.      This lawsuit involves the gruesome and unnecessary death of a mentally disabled man at the hands of Jennie Weisinger, an employee of the Burke Center in Lufkin, Texas.

8.      Mr. Chapman was enrolled in the HCS Waiver Program and received services through the Burke Center in Lufkin, Texas and resided at the "Cherry House" location of the Burke Center. At the time of his death, he was a 43-year-old male diagnosed with moderate intellectual disabilities, hypothyroidism, impulse control disorder, and morbid obesity. He was 5'6" tall and weighed 335 lbs. He lived at home until his mother became sick with cancer and needed chemotherapy treatments, at which time he became a resident of the Burke Center. He was noted to have an outgoing personality, loved to laugh and have fun, and had a close relationship with his family.

9.      Mr. Chapman had previously tested positive for COVID on Monday, June 27, 2022, and had been sent from the Burke Center to a hospital for medical treatment. He was released back to the Burke Center, but then had to return to the hospital two days later due to difficulty breathing. He was released back to the Burke Center shortly after, and on the fateful day of July 2, 2022, Mr. Chapman was in residence at the Cherry House of the Burke Center.

10.      On July 2, 2022, according to video timestamps, Mr. Chapman was isolated in a room at the Cherry House, vomiting continuously from at least 6:18 a.m. to 8:37 a.m.  On numerous occasions, video surveillance shows that Mr. Chapman asked Ms. Weisinger, the on-duty Burke Center employee, to call a nurse. On numerous occasions, video surveillance shows that Mr. Chapman asked Ms. Weisinger to get him to the hospital. Ms. Weisinger refused these requests, telling him she could not do anything for him, and **he wasn't going to the hospital "unless his lips turned blue".** On numerous occasions, as documented by video surveillance,

Mr. Chapman asked Ms. Weisinger for assistance, making her aware that he was vomiting repeatedly and was unable to sit upright in his chair. Ms. Weisinger refused to assist him, notify nursing staff, or get Mr. Chapman to the hospital. The DFPS Prepared a transcript of the horrible events that transpired in their APS Provider Abuse and Neglect Investigative Report:

| | |
|---|---|
| 6:17:30 | Ms. Weisinger puts on PPE to include gown, gloves, and facemask. |
| 6:18:23 | She enters Mr. Chapman's bedroom. |
| 6:18:37 | The following exchange can be heard between Mr. Chapman and Mrs. Weisinger: |

Mr. Chapman: "I thrown up again."

Ms. Weisinger: "Huh?"

Mr. Chapman: "I thrown up again."

Ms. Weisinger: "When?"

Mr. Chapman: "Right now."

Ms. Weisinger: "You got throw up on the wall."

Unintelligible conversation

Ms. Weisinger: "Where can I put the trash can so you won't throw up on yourself?"

Mr. Chapman: Unintelligible.

6:20:38    Mr. Chapman: "Call the nurse."

Ms. Weisinger: "No. The nurse can't do nothin' for you."

Mr. Chapman: Unintelligible.

Ms. Weisinger: "You need to put it over there, so you can get it. So you can throw up in it." Ms. Weisinger then says something about Mr. Chapman's shirt and having throw up on it.

Mr. Chapman: "I need a shirt."

Ms. Weisinger: "You're nasty."

Mr. Chapman: "Call the nurse."

Ms. Weisinger: "No, I'm not calling the nurse. You were throwing up the other day, and they didn't call a nurse."

Mr. Chapman: "Yes they did."

Ms. Weisinger: Unintelligible. "Don't be mad. Don't be mad." Unintelligible. "Because you're throwing up."

Mr. Chapman: "Need to go to the hospital."

Ms. Weisinger: "No you're not going to the hospital. I promise you that"

Mr. Chapman: "Hospital."

Ms. Weisinger: "You might as well get that out of your head. You're staying here till you get well. Okay?"

There is some muffled conversation inside the bedroom.

6:22:38    Ms. Weisinger says, "Do what?"

Mr. Chapman: Unintelligible.

Ms. Weisinger: "You want another shirt now?"

Mr. Chapman: "No."

Ms. Weisinger: Unintelligible.

Mr. Chapman: "Call the nurse."

Ms. Weisinger: "Huh?"

Mr. Chapman: louder this time, "Call the nurse."

Ms. Weisinger: "No. I'm not calling the nurse."

Mr. Chapman: "Please."

Ms. Weisinger: "Why?"

Mr. Chapman: "Because I'm throwing up."

Ms. Weisinger: "Huh?"

Mr. Chapman: Unintelligible.

Ms. Weisinger: "You're okay."

Mr. Chapman: "Wanna go to the hospital"

Ms. Weisinger: **"No, you're not going to the hospital. I can promise you that. That's not going to happen." Ms. Weisinger then states, "Not unless your lips turn blue. If your lips turn blue, then you can go to the hospital. Okay?"**

Mr. Chapman: "Okay."

Ms. Weisinger: "Okay." Ms. Weisinger then says something about the trash and a towel being right there, but it is unclear exactly what she is saying.

Ms. Weisinger: "Huh?"

Ms. Weisinger: Unintelligible followed by "Call nurse."

6:23:43    Ms. Weisinger exits Mr. Chapman's room, shuts the door, and removes her PPE just below the camera. She then sprays the immediate area with Lysol, walks across the room to dispose of her gloves, and walks into the office. Mr. Chapman can then be heard again saying, "Call the nurse" as Ms. Weisinger enters the office. She sits down in the chair, puts her glasses on, and begins writing something out. She picks up her phone and initiates voice command and states, "Gatorade." She initiates voice command again and says, "Gatorade drink." Puts her phone down and continues writing. She gets up and looks at the baby monitor that is inside the office out of camera view.

6:28:16    Ms. Weisinger speaks to Mr. Chapman through the monitor.

Ms. Weisinger: "Did you throw up again?... Did you throw up again?"

Mr. Chapman: "Yeah."

Ms. Weisinger: "Okay… put it under your (unintelligible)… Perfect."

Ms. Weisinger sits back down in the chair. She begins writing again. Utilizes voice command on her phone again and says, "Liquid," then again, "Because of coughing." She then goes back to reading/ documenting.

6:30:26    Mr. Chapman calls out something unintelligible, followed by "Jennie." Ms. Weisinger gets up from her chair, approaches the monitor, and says, "What do you need?"

Mr. Chapman: "Jennie."

Ms. Weisinger: "What?"

Mr. Chapman: "Look what happened."

Ms. Weisinger: "What?"

Mr. Chapman: Garbled response

Ms. Weisinger: "Do what?"

Mr. Chapman: "I throwed up again."

Ms. Weisinger: "Okay... okay. Get the towel... get that thing underneath your chin."

Mr. Chapman: Garbled response

Ms. Weisinger: "Okay… that's perfect. Thank you."

6:31:02      Ms. Weisinger sits back down at the desk. Mr. Chapman can be heard saying something about the nurse.

6:31:23      The house phone rings. Ms. Weisinger answers, "Cherry House. May I help you?... This is Jennie… (unintelligible) … Uh huh… Um, I'm the only one here… Who? Yeah… he does have a med book. It's here." There is further discussion about the meds for the other individual in the home and filling out papers before hanging up.

6:33:45      Mr. Chapman calls out. Ms. Weisinger does not respond.

6:35:53      Banging can be heard somewhere in the background and continues until Ms. Weisinger gets up and approaches the monitor at 6:36:01

6:36:24      Ms. Weisinger speaks to Mr. Chapman through the monitor.

Ms. Weisinger: "Is your tummy feeling better?... Is your tummy feeling better?"

Mr. Chapman: Garbled response... "Jennie."

Ms. Weisinger: "What?"

Mr. Chapman: Garbled response

Ms. Weisinger: "You need another towel?"

Mr. Chapman: Garbled response

Ms. Weisinger: 'You need another towel... alright I'll bring you one.

Mr. Chapman: "Throwing up."

6:37:31      Ms. Weisinger exits the office and turns to the right side of the camera into another area of the house. A few retching sounds can be heard from Mr. Chapman's room while Ms. Weisinger is out of camera view.

6:38:29      Ms. Weisinger enters the living room area with a laundry basket. She re-enters the office and puts her mask on. Mr. Chapman is calling out. Ms. Weisinger responds, "I'm coming... I'm coming, okay?" Mr. Chapman responds, "Throwing up."

6:39:21      Ms. Weisinger begins putting on PPE while Mr. Chapman can be heard moaning and calling out.

6:40:09      Mr. Chapman repeats, "Throwing up." Ms. Weisinger enters his bedroom with the basket of towels and has the following exchange with Mr. Chapman.

Mr. Chapman: "It's bad."

Ms. Weisinger: "What?"

Mr. Chapman: "It's bad... want out of my chair."

Ms. Weisinger: "You want out of your chair?"

Mr. Chapman: "I'm throwing up in it."

Ms. Weisinger: "Huh?"

Mr. Chapman: "I'm throwing up in it."

Ms. Weisinger: Unintelligible

Mr. Chapman: "Need another pad"

Ms. Weisinger: "You can't throw up one time in a pad and get rid of it."

Mr. Chapman: "Throwing up."

Ms. Weisinger: "You're running me ragged boy."

Mr. Chapman: Unintelligible response.

Ms. Weisinger: "How would you text the nurse, Jonathan?"

Mr. Chapman: "On my computer... call 'em. Call 'em."

Ms. Weisinger: "They can't do nothin' about it Jonathan… unintelligible… Do not throw that one. Okay?

**Segment 07022022-05**

Video begins at 6:41:27 with Ms. Weisinger speaking.

      Ms. Weisinger: "You need to throw up in this trash can."

      Mr. Chapman: "Yeah."

      Ms. Weisinger: "Yeah?... Okay… let it go. Its fine… If you're going to throw up, throw up (unintelligible)... thrown up drinking water two or three times…(unintelligible) … you don't have nothin' to throw up now. You need to get to sleep…No! No, no, no, no. Not till you quit throwing up. When you quit throwing up, we'll take it off, okay?"

      Mr. Chapman: "Call the nurse."

      Ms. Weisinger: "Huh?"

      Mr. Chapman: "Call the nurse."

      Ms. Weisinger: "I've already talked to her. She's not up yet."

 Muffled conversation

6:42:47    Ms.Weisinger exits the bedroom and groans. She removes her PPE, disposes of her gloves, and goes into another area of the home. She goes back into the office and stands in front of the monitor for a few moments. She then sits back down at the desk and begins writing.

6:48:05    Ms. Weisinger gets up from the desk and crosses the office to put a notebook away. She stands and faces the monitor.

6:49:00    Ms. Weisinger speaks into the monitor. "Jonathan, throw up on that (unintelligible) that I give you... Where's it at? Where's it at?"

      Mr. Chapman: Unintelligible

      Ms. Weisinger: "Then lay the towel there, so you can throw up on it."

      Mr. Chapman: Unintelligible

      Ms. Weisinger: "Yeah."

      Ms. Weisinger stands facing the monitor for a few more moments until turning around at 6:49:43.

6:49:52    Ms. Weisinger sits back down at the desk and begins writing again.

6:51:01    Ms. Weisinger gets back up and approaches the monitor. She stands facing the monitor for a few moments.

6:52:30    Ms. Weisinger picks up the monitor and takes it to the desk with her stretching the cord across the office. She sits back down at the desk.

6:52:55    Ms. Weisinger gets back up and places the monitor back in its previous location.

6:53:21    Ms. Weisinger exits the office with something in her left hand and looks out the window of the front door. She then walks across the living area and exits through a door adjacent to Mr. Chapmans room.

7:01:50    Mr. Chapman yells out.

7:05:20    Mr. Chapman calls out, "Jennie…Jennie…Jennie..."

7:06:28    The door to the left opens, and Ms. Weisinger enters from the outside. She goes into the kitchen area. She walks out of camera view. A kitchen appliance can be heard in use. She moves around the kitchen.

7:12:56    Ms. Weisinger enters the living room area and begins putting on PPE. She walks into the office to get a face mask. She exits the office and crosses the living area through the kitchen to another bedroom that is out of camera view. She asks the other individual in the home if he would like to get up and eat or if he just wants to sleep. They conversate for a few moments.

7:16:02        Ms. Weisinger re-enters camera view. She takes something back into the other bedroom and can be heard talking, although it is unclear what it is she is saying due to an echo between monitors.

7:16:42        Ms. Weisinger re-enters camera view and begins to take off her PPE. Mr. Chapman calls out, "Jennie… Jennie…" Ms. Weisinger continues to remove her PPE and walks across the living area back to the office. She stands in front of the monitor for a few moments.

    Ms. Weisinger: "I'm fixing to give [Resident No. 2] his meds."

    Mr. Chapman: Unintelligible

    Ms. Weisinger: "I'm giving [Resident No. 2] his medication.''

    Ms. Weisinger walks out of the office to the dining room table and then begins to put on PPE. She walks to another area of the home. A door can be heard opening and closing. She takes the monitor down and appears to be adjusting it in some way. She then sits back down at the desk and removes her mask.

7:19:14        Mr. Chapman calls out, but the volume is no longer at an audible level to make out his words. He can then be heard either coughing or retching. Ms. Weisinger continues to sit at the desk.

7:20:19        Ms. Weisinger places her mask back on her face and gets up to cross the office. She appears to be opening and closing the drawers to a file cabinet. She pulls out the medication box, which is a clear plastic box with a snap tip and returns to the desk with it. She begins to rifle through the contents of the box. She moves around the office and then returns to writing something at the desk.

7:25:02        [Resident No. 2] comes out of his bedroom and walks to the office.

7:25:08        Mr. Chapman can be heard very faintly, "Jennie?"

7:25:11        Ms. Weisinger responds, "I'm coming in just a minute."

7:25:25        [Resident No. 2] approaches the office door and speaks to Ms. Weisinger. [Resident No. 2]'s speech is unable to be understood through camera audio, and it appears that Ms. Weisinger is not able to understand [Resident No. 2] as she attempts to repeat what he could be saying several times and then tells him she is getting his medicine together and to go back to his room and she would bring it to him. Ms. Weisinger continues to sit at the desk dispensing medication.

7:28:08        Mr. Chapman calls out, "When are you gonna be in here?"

7:32:41        Mr. Chapman calls out, "Come here."

7:33:02        "Jennie."

7:33:36        "Jennie."

7:33:39         Mr. Chapman calls out louder, "Jennie!"

7:33:41        Even louder, "Jennie!"

7:33:45        Ms. Weisinger exits the kitchen and goes to the table to retrieve her PPE gown.

7:33:53        Mr. Chapman says, "Throwing up." He then yells, "Throwing up!" Ms. Weisinger continues putting on her PPE and does not respond.

7:33:57        Mr. Chapman calls out "Jennie!" Ms. Weisinger then walks to Mr. Chapman's room.

7:34:06         Ms. Weisinger enters Mr. Chapman's bedroom, and the following exchange occurs:  Mr. Chapman: Inaudible

    Ms. Weisinger: "What?"

    Mr. Chapman: Unintelligible

    Ms. Weisinger: "A what?"

Mr. Chapman: Unintelligible

Ms. Weisinger: "You already drank that whole thing?"

Mr. Chapman: "Feeling bad."

Ms. Weisinger: "Okay."

7:34:36      Ms. Weisinger exits Mr. Chapman's room. She crosses the living area to the other bedroom and conversates with [Resident No. 2] for a few moments.

7:36:07      Ms. Weisinger exits the other bedroom. She takes some dishes to the kitchen. She remains in the kitchen. She remains in the kitchen until 7:41:42.

7:41:27      Ms. Weisinger begins to remove and discard her PPE.

7:42:19      Ms. Weisinger enters the office again and puts the med box in the filing cabinet. She sits back down at the desk and begins to write again. She gets up and retrieves something from the filing cabinet then sits back down and begins writing.

7:44:58      She gets back up and puts something back into the filing cabinet and then spends a few moments going through drawers.

Mr. Chapman: Inaudible response

7:45:58      Mr. Chapman can be heard through the monitor saying something about medicine.

Ms. Weisinger: "Are you still throwing up?"

Mr. Chapman: Unintelligible

Ms. Weisinger: "Have you quit throwing up?"

Mr. Chapman: Unintelligible

Ms. Weisinger: "It stopped?"

Mr. Chapman: Unintelligible

Ms. Weisinger: "Okay." She then sits back down at the desk and gets something out of the desk drawer. She sits there for a few moments before she begins writing something again.

7:48:03      Mr. Chapman can be heard through the monitor again. "Come here." Ms. Weisinger closes her book and picks up what appears to be her cell phone. Mr. Chapman can be heard again, but he is not loud enough to determine what he is saying.

7:48:50      Mr. Chapman calls out louder, "Jennie."

7:48:53      He calls out again, "Jennie." Ms. Weisinger continues to look at her cell phone.

7:49:38      Mr. Chapman calls out again. Ms. Weisinger does not respond.

7:49:41      "Jennie!"

7:49:44      Louder, Jennie!"

7:49:51      "Jennie!"

7:50:10      Ms. Weisinger gets up from the desk and crosses the office to the monitor. She responds, "Jonathan, what do you need?"

Mr. Chapman: "I feel bad."

Ms. Weisinger: "I know you feel bad… I think the medicine will make you feel a little bit better (unintelligible). It's for the sickness."

Mr. Chapman: Inaudible response

Ms. Weisinger: "Try to get some sleep, and that'll help."

7:50:50      Ms. Weisinger goes back to the desk and blows her nose. Mr. Chapman calls out. Ms. Weisinger sits back down at the desk as Mr. Chapman calls out, "Jennie."

7:51:10      Mr. Chapman calls out again. Ms. Weisinger gets up from her chair and returns to the monitor.

Ms. Weisinger: "Yes Jonathan?"

Mr. Chapman: Unintelligible

Ms. Weisinger: "Do what?"

Mr. Chapman: Inaudible

Ms. Weisinger: "Go night-night."

Mr. Chapman: "Come in here."

Ms. Weisinger: "I can't walk in the room again."

Mr. Chapman: Inaudible

Ms. Weisinger: "(unintelligible) the next one to walk in your room, okay?"

Mr. Chapman: "Feel bad."

Ms. Weisinger: "Go night- night."

Mr. Chapman: Unintelligible

7:51:49     Ms. Weisinger turns and walks away from the monitor to the desk again. As she sits down, she says out loud, "He hasn't slept all night."

7:53:39     Retching sounds can be heard through the monitor. Ms. Weisinger remains at the desk.

7:53:53     Ms. Weisinger gets up from the desk and goes to the filing cabinet. She gets something out of the filing cabinet and returns to the desk and begins to look through a notebook.

7:55:26     Coughing/ retching sounds can be heard. Ms. Weisinger remains at the desk.

7:57:16     Ms. Weisinger gets up from the desk and goes into the living room area. She begins putting on gloves and her PPE gown.

7:57:45     Mr. Chapman calls out loudly. Ms. Weisinger does not respond.

7:58:31     Mr. Chapman  calls out again, "Jennie." Ms. Weisinger does not respond but continues to secure PPE

7:58:57     Ms. Weisinger enters Mr. Chapman's room.

7:59:01     Ms. Weisinger exits Mr. Chapman's room with an object in her hand. She does not speak to Mr. Chapman. She then walks across to the other bedroom and speaks with [Resident No. 2].

7:59:42     Mr. Chapman calls out, "Jennie!"

7:59:51     He calls out again, louder this time, "Jennie!"

8:00:19     Mr. Chapman calls out again even louder.

8:00:27     Even louder, "Jennie!"

8:00:35     "Jennie!" Ms. Weisinger can still be heard talking with [Resident No. 2] in the other bedroom, although it cannot be determined what is being said.

8:01:13     "Jennie."

8:01:16     "Jennie."

8:01:24     "Jennie."

8:01:59     "Jennie."

8:02:02     Ms. Weisinger exits [Resident No. 2]'s room and enters camera view again. She walks across the room holding an object in her hand and walks to Mr. Chapman's bedroom.

8:02:13     Ms. Weisinger enters Mr. Chapman's bedroom. Sounds as if something is being sprayed, and Mr. Chapman can be heard saying something to Ms. Weisinger, but it cannot be determined what is being said.

8:02:45     Mr. Chapman says, "Bad."

Ms. Weisinger: "Huh?"

Mr. Chapman: "Bad."

Ms. Weisinger: "Mad?"

Mr. Chapman: "Feel bad."

Ms. Weisinger: "I know you feel bad. You want anything else?"

Mr. Chapman: Unintelligible

Ms. Weisinger: "I know. Try to get some sleep, okay? Because you didn't sleep none last night."

Mr. Chapman: "(Unintelligible) drink."

Ms. Weisinger: "Okay, I'll get you something to drink. What you want?

Mr. Chapman: "Sprite."

Ms. Weisinger: "Okay. Sprite."

8:03:18    Ms. Weisinger exits the bedroom and goes into the kitchen. She re-enters the bedroom at 8:03:50 with something in her hand and says, "Okay, try to get some sleep."

8:04:02    Ms. Weisinger exits the bedroom. She removes her PPE, picks up what appears to be a small piece of paper from the dining table, and walks back across the room to the office. She sits down at the desk.

8:05:00    Mr. Chapman calls out. Ms. Weisinger responds with, "Oh Lord."

8:05:05    Ms. Weisinger gets up from the desk and goes to the monitor.

Ms. Weisinger: "What happened?"

Mr. Chapman: Garbled response

Ms. Weisinger: "No I cannot come back in there."

Mr. Chapman: Garbled response.

Ms. Weisinger: "I'm sorry, I cannot come back in there."

Mr. Chapman: Garbled response

Ms. Weisinger: "Go to sleep. Go to sleep."

Mr. Chapman: "Throw up."

Ms. Weisinger: "Ugh."

8:05:29    Ms. Weisinger sits back down at the desk and begins writing again. She gets up from her desk and goes to the filling cabinet. Mr. Chapman can be heard calling out again, but it sounds quieter. Ms. Weisinger calls out across the house, "Go to sleep!" Sits back down at the desk and begins writing again.

8:06:58    Mr. Chapman calls out, "Need help."

8:07:01    "Jennie." Ms. Weisinger does not acknowledge and continues to write.

8:14:08    Mr. Chapman calls out. Ms. Weisinger is typing on the computer and does not acknowledge Mr. Chapman.

8:14:022   He calls out again.

8:15:08    Mr. Chapman calls out, "Throwing up!"

8:15:12    "Throwing up!"

8:15:39    Retching sounds

8:15:42    Mr. Chapman yells out, "Jennie!" Ms. Weisinger does not respond and continues to work at the desk.

8:15:47    Mr. Chapman calls out again, "Jennie."

8:15:51    Louder, "Jennie!"

8:15:53    "Jennie, Help!"

8:16:00    "Throwing up."

8:16:18    Retching sounds

8:16:27    Even louder, "Jennie!"

| | |
|---|---|
| 8:16:30 | Even louder, "Jennie!" |
| 8:16:33 | "Jennie!" Ms. Weisinger gets up from the desk and walks to the monitor. |
| | Ms. Weisinger: "What is wrong Jonathan?" |
| | Mr. Chapman: Unintelligible due to echo between monitors |
| | Ms. Weisinger: "What?" |
| | Mr. Chapman: Unintelligible |
| | Ms. Weisinger: "What?" |
| | Mr. Chapman: "I'm throwing up." |
| | Ms. Weisinger: "Talk to me in English." |
| | Mr. Chapman: Unintelligible |
| | Ms. Weisinger: "I don't see anything wrong with you. You're fine." |
| | Mr. Chapman: Garbled response |
| | Ms. Weisinger: "Go to sleep." |
| | Mr. Chapman: "Throwing up." |
| | Ms. Weisinger: "Go night- night." |
| | Mr. Chapman: "Throwing up... real bad." |
| | Ms. Weisinger: "Where's those pads I gave you?... Where's the pads I gave you?" |
| | Mr. Chapman: "I throwed 'em away." |
| | Ms. Weisinger: "Why? Jonathan, there's a whole bunch of 'em (unintelligible)." |
| | Mr. Chapman: "I throwed 'em away." |
| | Ms. Weisinger: "Did you just throw up on yourself?" |
| | Mr. Chapman: "Uh-huh" |
| | Ms. Weisinger: "Well that's not good." |
| | Mr. Chapman: "Throwing up." |

8:18:01        Ms. Weisinger walks out of the office and says out loud, "Getting' on my nerves." She walks into the hallway to the right and says something unintelligible while out of camera view.

| | |
|---|---|
| 8:18:45 | Mr. Chapman calls out, "Hurry!" |
| 8:18:47 | "Hurry!" |
| 8:18;50 | "Bad!" |
| 8:19:34 | "Hurry!" |
| 8:19:40 | "Hurry!" |
| 9:19:42 | "Jennie." |

9:20:00        Ms. Weisinger re-enters camera view. She crosses the living area to Mr. Chapman's bedroom carrying a towel.

8:20:15         Ms. Weisinger opens Mr. Chapman's bedroom door and then walks back out without the towel.

8:20:36        Ms. Weisinger enters the office and sits back down at the desk.

8:21:07        Ms. Weisinger gets up from the desk and walks into the hallway to the right.

8:21:25        Mr. Chapman yells out "Get me up!" … "Get me up!"

8:22:59        Ms.Weisinger enters the living area from the hallway. She goes into the kitchen and opens and closes a drawer.

8:24:34        Ms. Weisinger goes back into the office. She faces the monitor for a moment and then leans down to get something.

8:25:07        Ms. Weisinger exits the office and goes into the hallway.

8:26:52        Mr. Chapman calls out, "Help."

8:27:00        "Help."
8:29:08        "Jennie."
8:27:10        "Jennie, help," followed by retching sounds.

**Segment 07062022-06**

8:28:38        Mr. Chapman calls out, "Help." He calls out again, sounding garbled.
8:28:56        He calls out again.
8:29:02        Mr. Chapman calls out, "Help."
8:29:06        He calls out again.
8:29:18        Mr. Chapman can be heard moaning.
8:29:21        He calls out.
8:29:24        He calls out again.
8:29:30        Mr. Chapman calls out, sounding garbled.
8:29:50        He calls out for help.
8:29:52        "Somebody help."
8:29:59        Mr. Chapman calls out again, sounding garbled.
8:30:09        Moaning sounds
8:30:12        Calls out again, sounding garbled.
8:30:28        Mr. Chapman calls out for help, louder this time.
8:30:32        He yells for help even louder and begins to moan. Ms. Weisinger enters the living room from the hallway to the right side of the screen and goes into the office.
8:30:38        Ms. Weisinger gets on the monitor and has the following exchange with Mr. Chapman:

        Ms. Weisinger: "Jonathan, I was in the bathroom using the bathroom. What do you need?"

        **Mr. Chapman: "I need help."**
        **Ms. Weisinger: "What?"**
        **Mr. Chapman: "I said I need help!"**
        **Ms. Weisinger: "Sit up in the chair."**
        **Mr. Chapman: "I can't get up."**
        Ms. Weisinger: "Sit up in the chair."
        Mr. Chapman: Garbled response
        Ms. Weisinger: "Where's that towel I gave you?"
        Mr. Chapman: Garbled response…" throw up"
        Ms. Weisinger: "You what?"
        Mr. Chapman: Garbled response
        Ms. Weisinger: "Jonathan, quit throwing them on the floor please."
        Mr. Chapman: Garbled response
        Ms. Weisinger: "Jonathan, go to sleep!"
        Mr. Chapman: "I need help!"
**8:31:23        Ms. Weisinger leaves the office and goes back into the hallway.**
**8:31:45        Mr. Chapman calls out for help.**
**8:32:25        "Help!"**
**8:32:35        "I need help!"**
**8:32:44        Ms. Weisinger comes back into the living room with a garbage bag and goes into the office. She gets on the monitor and has the following exchange with Mr. Chapman:**

Ms. Weisinger: "Jonathan, stop yelling. I've got work to do. Do you understand me?"

Mr. Chapman: "I need help. I'm throwing up."

Ms. Weisinger: "I gave you a towel. You're not getting another one."

Mr. Chapman: Garbled response

Ms. Weisinger: "Figure it out."

Mr. Chapman calls out for help again while Ms. Weisinger continues to bag trash in the office.

Ms. Weisinger: "Jonathan, I'm going outside. Don't be sitting here screaming. Do you understand me? Say yes ma'am."

Mr. Chapman: Garbled response

Ms. Weisinger: "Say yes ma'am."

Mr. Chapman can be heard talking through the monitor but unable to determine what is being said.

8:34:13     Ms. Weisinger exits the office. Mr. Chapman can still be heard through the monitor. Ms. Weisinger turns back into the office and gets on the monitor to say, "Bye" and then walks out again.

8:34:27     Mr. Chapman yells, "I'm throwing up!"

8:34:35     "Help!" followed by retching sounds. Ms. Weisinger continues to gather trash.

11.     At 8:35, Ms. Weisinger took a "smoke break", and left Mr. Chapman to vomit and

choke on his own vomit until he became unresponsive:

8:35:59     Ms. Weisinger picks up cigarettes and cell phone and exits the home through the back door.

8:36:01     Mr. Chapman can be heard calling for help, although much quieter than before.

8:36:25     "Throwing up."

8:36:32     Garbled noises are heard from Mr. Chapman's room.

8:37:18     Mr. Chapman calls out quietly, "Jennie."

8:37:21     "Jennie…Jennie."

8:37:47     More retching sounds can be heard.

8:37:48     "Throwing up!"

8:37:48     "Jennie."

8:37:55     Mr. Chapman repeats very quietly, "Jennie." No sounds are heard from Mr. Chapman's after this time.

8:52:47     Ms. Weisinger enters camera view and walks to the hallway on the other side of the living room then goes into the office and sits down to begin flipping through paperwork. She proceeds to begin writing in a notebook and continues doing this for approximately five minutes. She then turns her chair around to get something off the floor and gets something out of a plastic bag before she ever checks the monitor.

8:58:43     Ms. Weisinger looks up toward the monitor. She stands up from her chair and appears to be looking closer.

8:58:57     She leaves the office and goes into the hallway. She can be heard coughing and spitting.

9:00:04       Ms. Weisinger enters the office again and looks closely at the monitor. She stands there looking at the monitor for approximately 40 seconds before she exits the office to walk to Mr. Chapman's room.

9:01:05       Ms. Weisinger enters Mr. Chapman's room and says, "Jonathan, what are you doing? Jonathan? Hey!" Ms. Weisinger repeats Mr. Chapman's name twice. Slapping/clapping sound can be heard. "Jonathan!" followed by hitting sounds. "Hey!"

9:01:31       She runs from the bedroom into the office and gets her phone. She begins speaking to the 911 operator. She gives the address of the home and re-enters Mr. Chapman's bedroom. **"Jonathan! Jonathan! He's not responding to nothing! His lips are blue!** Ms. Weisinger continues to say Mr. Chapman's name. She is then heard crying. "Oh God! Oh my God! Wake up! Jonathan!" Ms. Weisinger continues to communicate with 911. "Okay, I'm doing it. Jonathan!" Loud hitting/slapping sounds can be heard. She gives her name to the operator. "No! He's unresponsive! I can't! He's like 400 pounds and in a recliner. That's as far as I can get him down without…(unintelligible)."

9:07:24       Ms. Weisinger exits the bedroom and goes to the front door and opens it. Sirens can be heard. She tells the 911 operator she can hear them.

9:09:12       Paramedics enter the home and go into the bedroom.

9:10:02       Ms. Weisinger sits down at the dining table. One of the paramedics asks, "He was talking and acting normal five minutes ago?" Ms. Weisinger says, "Yes, I checked the baby monitor, and he wasn't breathing." Ms. Weisinger appears to be out of breath and breathing heavily. Ms. Weisinger gets on the phone and says, "Please answer!" The police then enter the home. The paramedic tells Ms. Weisinger, "I need you to talk to me and tell me what's going on." Ms. Weisinger responds, "He's been throwing up all day."

9:13:50       EMS workers roll Mr. Chapman out of the bedroom on a stretcher. A substance is seen around his mouth/chin area.

12.       Mr. Chapman died from aspirating his own vomit. Mr. Chapman was deprived of his civil rights to reasonably safe conditions, to be free from undue restraint, to adequate medical care, and to protection from harm. Mr. Chapman's death was needless and could have been easily prevented had his basic constitutional rights been respected. Instead, the Burke Center and Ms. Weisinger's deliberate indifference caused Mr. Chapman's death.

13.       Ms. Weisinger was found by the Texas Department of Family and Protective Services to have neglected Mr. Chapman, which rose to a level of reportable conduct under Title 26, Chapter 711.1408 of the Texas Administrative Code. She failed to follow established protocol during a medical emergency as described above. Ms. Weisinger also admitted to the DFPS investigator that she did not assist Mr. Chapman because she was frustrated. Ms.

Weisinger also admitted to falsifying Mr. Chapman's vital signs, specifically the time low oxygen levels were noted (88%). Further, Ms. Weisinger failed to call 911 despite the policy that if an individual's O2 saturation is below 90%, 911 must be called immediately and also a nurse must be notified immediately via phone call. Ms. Weisinger was aware of this and chose to text the low oxygen levels to the nurse instead of calling the nurse and did NOT call 911. Ms. Weisinger acted with deliberate indifference toward Mr. Chapman in his time of medical need. Ms. Weisinger's actions and inactions resulted in Mr. Chapman's death.

14.     At all material times, Ms. Weisinger was acting in the course and scope of her employment as Direct Care Staff for the Burke Center. At all material times, Ms. Weisinger was acting under the color of law.

15.     At all material times, the Burke Center is a community center that provides mental health and intellectual disability services.

16.     At all material times, a special relationship existed between Mr. Chapman and the Burke Center and Ms. Weisinger. As explained above, Mr. Chapman was a resident of the Burke Center. The Burke Center and Ms. Weisinger were his custodians and he was their ward, incapable of exercising free will, protecting himself, or seeking medical care. The custodial relationship obligated the Burke Center and Ms. Weisinger to provide constitutionally protected rights for Mr. Chapman, including his rights to adequate medical care, protection from harm and to be free from undue restraint. The Burke Center and Ms. Weisinger failed to provide those rights and instead acted with deliberate indifference to Mr. Chapman's rights. The Burke Center and Ms. Weisinger's conduct violated Mr. Chapman's rights recognized in caselaw and secured to him through the Due Process Clause of the Fourteenth Amendment and Fourth Amendment, including the rights to reasonably safe conditions, to be free from undue restraint, to adequate

medical care, and to protection from harm.

17.     On information and belief, at all material times, the Burke Center had a custom and persistent and widespread practice of not having appropriately trained staff in place to provide attention to its wards and that resulted in the complete failure to provide reasonably safe conditions, to keep Mr. Chapman free from undue restraint, to provide adequate medical care to Mr. Chapman, and to protect Mr. Chapman from harm. The persistent and widespread practice of not having qualified training or supervision led to the horrible mistreatment of Mr. Chapman, and his subsequent gruesome and needless death by aspiration on his own vomit. On information and belief, there had been prior incidents and investigations into the Burke Center, known to the administrators, but that the administrators chose to maintain the customs despite the danger posed to its residents and wards by lack of supervision and qualified staff. Thus, the Burke Center, by and through its employees and Ms. Weisinger: (1) created a custom and allowed a custom under which unconstitutional practices occurred; (2) after learning of the violations, it failed to remedy the wrongs as evidenced by the death of Mr. Chapman; and (3) it was grossly negligent in managing, supervising and training subordinates who caused or committed the wrongful acts described herein. The Burke Center and Ms. Weisinger each acted with reckless or callous and deliberate indifference to Mr. Chapman's life, health and dignity as a human being, and to his constitutional and statutory rights.

## V. Count One: Violation of 42 U.S.C. § 1983 by Ms. Weisinger under the Fourteenth Amendment to the U.S. Constitution

18.     Plaintiff incorporates the above paragraphs by reference.

19.     This Count is asserted against Burke Center employee Ms. Weisinger, in her official and individual capacities. Ms. Weisinger deprived Plaintiff of rights and privileges secured to him by the Fourteenth Amendment to the United States Constitution and by other

laws of the United States by failing to protect him and exposing him to a substantial risk of harm and through indifference to his safety, in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the cited constitutional provisions.

20.   At all times, a special relationship existed between Ms. Weisinger and Mr. Chapman by virtue of the custodial nature of the relationship over Mr. Chapman as a resident and ward of the Burke Center, who was also restrained by Ms. Weisinger at the Burke Center pursuant to the Burke Center's customs and policies which were administered by Ms. Weisinger. By taking away Mr. Chapman's liberty to take care of himself, Ms. Weisinger became the custodian of Mr. Chapman and constitutionally obligated to provide him his civil rights.

21.   At all times relevant, Ms. Weisinger had a duty to provide for Mr. Chapman's safety, adequate medical care, protect him from harm, and leave him free from undue restraint by virtue of her position. Ms. Weisinger was the hands-on staff attending to Mr. Chapman. Ms. Weisinger violated Mr. Chapmans civil rights, including by:

a. Failing to provide Mr. Chapman with constitutionally adequate medical care;

b. Acting with a deliberate indifference to the medical needs of Mr. Chapman;

c. Holding Mr. Chapman against his will and subjecting him to undue restraint;

d. Creating a custom and allowing a custom under which unconstitutional practices occurred;

e. Creating a custom and allowing a custom under which un-supervised and un-trained subordinates were permitted to take action against Mr. Chapman  and directing treatment;

f. Creating a custom and allowing a custom under which un-supervised and un-trained subordinates were permitted to hold residents against their will and restrain residents without being properly trained to do so;

g. Creating a custom or policy under which restrained residents would be deprived of adequate medical care.

22.    By acting with deliberate indifference to Mr. Chapman's medical needs and subjecting him to undue restraint and creating a custom or practice that permitted such to occur, Ms. Weisinger subjected him to pain, physical and mental injury, and death. At all times, Ms. Weisinger had actual and constructive notice, based on prior incidents and customs of the Burke Center, that Mr. Chapman was at profound risk of harm or death if his medical needs were ignored. Ms. Weisinger's conduct, custom and habit was so egregious, arbitrary, brutal and indecent that it shocks the contemporary conscience. These violations of Mr. Chapman's civil rights caused his death, and for these violations, Plaintiff seeks all available compensatory and exemplary damages permitted at law.

## VI. Count Two: Violation of 42 U.S.C. § 1983 by the Burke Center Under the Fourteenth Amendment to the U.S. Constitution

23.    Plaintiff incorporates the above paragraphs by reference.

24.    At all times, a special relationship existed between the Burke Center and Mr. Chapman by virtue of the custodial nature of the relationship because Mr. Chapman was a resident and ward of the Burke center, and restrained by the Burke Center against his will. By taking away Mr. Chapman's liberty to take care of himself, the Burke Center became custodian of Mr. Chapman and constitutionally obligated to provide him his civil rights.

25.    The Burke Center, through its employees, violated Mr. Chapman's civil rights, including by:

a. Failing to provide Mr. Chapman with constitutionally adequate medical care;

b. Acting with a deliberate indifference to the medical needs of Mr. Chapman;

c. Holding Mr. Chapman against his will and subjecting him to undue restraint;

d. Creating a custom and allowing a custom under which unconstitutional practices occurred;

e. Creating a custom and allowing a custom under which un-supervised and un-trained subordinates were permitted to take action against Mr. Chapman;

f. Creating a custom and allowing a custom under which un-supervised ad un-trained subordinates were permitted to hold residents against their will and restrain residents without being properly trained to do so;

g. Creating a custom or policy under which restrained residents would be deprived of adequate medical care.

26      By acting with deliberate indifference by failing to provide Mr. Chapman with constitutionally adequate medical care and holding him against his will, subjecting him to undue restraint – and creating a custom or practice that permitted such to occur – the Burke Center subjected him to pain, physical and mental injury, and death. At all times, the Burke Center had actual and constructive notice that Mr. Chapman was at a profound risk of harm or death at the hands of improperly trained and unqualified subordinates in the Burke Center residences such as the Cherry house, but nonetheless permitted such harm to occur without remedying it. The Burke Center's conduct custom and habit was so egregious, arbitrary, brutal and indecent that it shocks the contemporary conscience. These violations of Mr. Chapman's civil rights caused his death, and for these violations, Plaintiff seeks all available compensatory and exemplary damages permitted at law.

27.     At all relevant times, the Burke Center was vicariously liable for the acts and omissions of its employee, Ms. Weisinger. At all relevant times, the Burke Center administrators had the right to direct, administer, supervise, manage, hire and fire and otherwise control Ms.

Weisinger such that they are legally responsible for the action taken by Ms. Weisinger.

## VII. No Qualified Immunity Under §1983

28.     Burke Center employees carrying out a discretionary function can be entitled to qualified immunity to their individual liability, but this immunity is waived if the complainant shows that:

a.  The individual's acts deprived the party of constitutional rights under color of law;

b.  The deprived rights were clearly established and constitutional rights that existed at the time of the acts; and

c.  Such acts were not objectively reasonable under the circumstances; that is, no reasonable official could have believed at the time that the conduct was lawful.

Defendants were persons acting under color of state law, when creating, promulgating, and enforcing Burke policies, customs and procedures for the residents of the Burke Center, by their failure to properly train in the handling of such persons, deprived Mr. Chapman of his civil liberties without due process of law by failing to provide for his basic human needs, such as reasonably safe conditions, freedom from undue restraint, adequate medical care, and protection from harm. No reasonable Burke Center official could have believed that forcing Mr. Chapman to stay in a reclined chair while repeatedly vomiting for hours, refusing to help him sit up in his chair, refusing to call a nurse, refusing to call an ambulance, refusing to get Mr. Chapman to the hospital "until his lips turned blue" and then abandoning him for half an hour to aspirate his own vomit, thus depriving or failing to provide appropriate medical attention, was lawful. The acts of Defendants, when viewed objectively, were unreasonable under the circumstances. Therefore, qualified immunity is waived in this case.

29.     The acts of Defendants clearly violated established statutory or constitutional

rights of which a reasonable person would have known, including the constitutional rights afforded by the Due Process Clause, and the Fourteenth Amendment of the United States Constitution. *Youngberg v. Romeo*, 457 U.S. 307 (1982); *Sims v. Griffin*, 35 F.4th 945 (5th Cir. 2022). The acts of Defendants were so obviously and grossly wrong that only a plainly incompetent organization or its employee, or one who was knowingly violating the law, would have performed such an act and, therefore, Defendants are liable to Mr. Chapman for the damages caused by their actions.

30.    These acts resulted in the severe injury and horrific death of Mr. Chapman. Such acts were not objectively reasonable under the circumstances; that is, no reasonable official could have believed at the time that the conduct was lawful.

31.    The Defendants involved in this case, acting under color of state law, were deliberately indifferent to the excessive risk to Plaintiff's health and safety in their acts or failures to act. Alternately, deliberate indifference is not the standard, but rather the lesser standard enunciated in *Youngberg* should apply to the denial of constitutional rights to Mr. Chapman, a resident of a mental health facility, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person actually did not base the decision on such a judgment." 457 U.S. 307, 323. Such acts violated and deprived Plaintiff's clearly established constitutional rights and were not objectively reasonable.

## VIII. Damages

### A.  Damages for the Estate of Jonathan Chapman

32.    Pursuant to Tex. Civ. Prac. & Rem. Code §71.021 and the uncapped damages recoverable under 42 U.S.C. § 1983, Jonathan Chapman's estate is entitled to and seeks damages

for the following elements from the time of the incident complained of until the time of his death:

A.     Physical pain and suffering of Jonathan Chapman;

B.     Mental anguish of Mr. Chapman;

C.     Humiliation;

D.     Loss of dignity;

E.     Physical impairment, physical incapacity and physical disability; and

F.     Funeral expenses.

33.     As a result of the foregoing, Jonathan Chapman incurred injury and damages in an amount in excess of the minimum jurisdictional limits of this court, and Plaintiff pleads for such damages as authorized in this case. Plaintiff further requests that this case be tried to a jury and that the Estate of Jonathan Chapman should be awarded fair and reasonable damages as determined by the jury.

**B. Damages of Frank Chapman**

34.     Frank Chapman, as a wrongful death beneficiary and father of Jonathan Chapman, seeks damages pursuant to the Wrongful Death Statute and pursuant to the uncapped damages available under 42 U.S.C. § 1983 including, but not limited to the following:

A. The loss of affection, comfort, companionship, society, emotional support, and love which Frank Chapman would, in some reasonable probability have received from Jonathan Chapman had he lived;

B. Physical pain and suffering in the past and which in reasonable probability, Frank Chapman will continue to suffer in the future;

C. Mental anguish in the past and which, in reasonable probability, Frank Chapman will continue to suffer in the future;

D. Damages for humiliation and loss of dignity in the past and which, in reasonable probability, Frank Chapman will continue to suffer in the future.

35.     The above damages are in excess of the jurisdictional limit of this Court.

**C. Exemplary Damages**

36.     Plaintiff alleges that each and every act and/or omission of Ms. Weisinger and the Burke Center and their agents, as set forth above, constituted a deliberate indifference to and violation of the civil rights of Jonathan Chapman for which punitive damages are sought and must be awarded. Plaintiff additionally alleges when viewed objectively from the standpoint of policymakers at the time policies were established, involved an extreme degree of risk, considering the probability and magnitude of the physical harm to others in that the Defendants had actual subjective awareness of the risks involved, but nevertheless provided with conscious indifference to the rights, safety or welfare of Plaintiff, and as such, such conduct amounts to gross negligence or malice, as those terms are defined by law, so as to give rise to an award of exemplary or punitive damages, for which Plaintiff now pleads, jointly and severally, against the Individual Defendants. Additionally, by reason of such conduct, Plaintiff is entitled to and therefore asserts a claim for punitive and exemplary damages in an amount sufficient to punish and deter the Defendants, and others like them from such conduct in the future.

## IX. Jury Demand

37.     Plaintiff requests a jury trial and tenders the required jury fee.

## X. Prayer

Plaintiff asks that this Court enter a judgment in favor of plaintiff, an award of damages as explained above, costs, pre- and post-judgment interest, and other special damages in accordance with the relief he is entitled, and such other relief as the Court deems just and proper.

Respectfully submitted,



202 West Erwin, Suite 202
Tyler, Texas 75702
(903) 526-1600 Telephone
(903) 595-0796 Telefax
mallen@martinwalkerlaw.com


By:    ___/s/ Marisa Allen_____
       Marisa Allen
       Bar I. D. No. 24039163

       ATTORNEYS FOR PLAINTIFF