**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| **Frank Chapman, Individually and as** | § | |
| **Heir of the Estate of Jonathan Chapman,** | § | |
| **Deceased,** | § | |
| | § | |
| *Plaintiff,* | § | **Civil Action No.** |
| | § | **9:24-CV-00116** |
| **v.** | § | |
| | § | |
| **Jennie Weisinger and Burke Center,** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

---

## DEFENDANT BURKE CENTER'S
## MOTION TO DISMISS AND BRIEF IN SUPPORT

---

Joel E. Geary
State Bar No. 24002129
jgeary@wslawpc.com
James M. Welch
State Bar No. 00785210
jwelch@wslawpc.com
WADDELL SERAFINO GEARY
  RECHNER JENEVEIN, P.C.
1717 Main Street, Suite 2500
Dallas, Texas 75201
214/979-7400 Telephone
214/979-7402 Facsimile

Wayne D. Haglund
State Bar No. 08697500
whaglund@haglundlaw.com
WAYNE DOUGLAS HAGLUND
  LAW OFFICE, P.C.
107 W. Kerr Avenue
Lufkin, Texas 75904
936/639-0007 Telephone
936/639-0016 Facsimile

*Attorneys for Defendant Burke Center*

---

### TABLE OF CONTENTS

I.    Summary.................................................................................................. 1

II.   Statement of Issues............................................................................... 3

III.  Factual Allegations .............................................................................. 3

IV.  Standard of Review.............................................................................. 7

V.   Argument and Authorities.................................................................. 8

    A.  Governmental entity liability under 42 U.S.C. § 1983 ............................. 8

    B.  Chapman fails to adequately plead that a policy or custom attributable to the Center's policymakers caused his injuries................. 9

    C.  Alternatively, Chapman fails to adequately plead an underlying constitutional violation ............................................................. 17

VI.  PRAYER ................................................................................................ 24

## TABLE OF AUTHORITIES

**Cases**                                                                                  **Page**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................... 8

*Berry v. Texas Woman's Univ.,*
    528 F. Supp. 3d 579 (E.D. Tex. 2021) ................................................................... 8

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................ 7,8

*Brown v. Tarrant County, Texas,*
    985 F.3d 489 (5th Cir. 2021) ............................................................................... 10

*Causey v. Sewell Cadillac-Chevrolet, Inc.,*
    294 F.3d 285 (5th Cir. 2004) ............................................................................ 6,15

*City of Canton v. Harris,*
    489 U.S. 378 (1989) ............................................................................................. 11

*Connick v. Thompson,*
    563 U.S. 54 (2011) ............................................................................................... 11

*Cuvillier v. Taylor,*
    503 F.3d 397 (5th Cir. 2007) ................................................................................ 7

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,*
    489 U.S. 189 (1989) ..........................................................................................21,22

*Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys,*
    675 F.3d 849 (5th Cir. 2012) ................................................................................ 7

*Dorsey v. Portfolio Equities, Inc.,*
    540 F.3d 333 (5th Cir. 2008) ............................................................................ 6,15

*Fee v. Herndon,*
    900 F.2d 804, 807 (5th Cir. 1990) ........................................................................ 8

*Johnson v. Harris County,*
    83 F.4th 941 (5th Cir. 2023) ................................................................................ 12

*Littell v. Houston Indep. Sch. Dist.,*
    894 F.3d 616 (5th Cir. 2018) .................................................................................. 7

*Monell v. Dep't of Social Servs.,*
    436 U.S. 658 (1978) ......................................................................................... 8,17

*Paul v. Davis,*
    424 U.S. 693 (1977) ............................................................................................ 23

*Pena v. City of Rio Grande,*
    879 F.3d 613 (5th Cir. 2018) ...........................................................................11,12

*Pineda v. City of Houston,*
    291 F.3d 325 (5th Cir. 2002) ................................................................................ 9

*Spiller v. City of Texas City, Texas,*
    130 F.3d 162 (5th Cir. 1998) .............................................................................. 11

*Valle v. City of Houston,*
    613 F.3d 536 (5th Cir. 2010) ................................................................................ 9

*Verastique v. City of Dallas,*
    106 F.4th 427 (5th Cir. 2024) ............................................................................. 12

*Walton v. Alexander,*
    44 F.3d 1297 (5th Cir. 1995) ...........................................................................21,22

*Youngberg v. Romeo,*
    457 U.S. 307 (1982) ....................................................................................18,20,21

*Zarnow v. City of Wichita Falls,*
    615 F.3d 161 (5th Cir. 2010) .............................................................................. 10

<u>STATUTES</u>                                                                                    <u>PAGE</u>

Fed. R. Civ. P. 8(a)(2) ................................................................................. 7

Fed. R. Civ. P. 12(b)(6) ............................................................................... 7


TEX HEALTH & SAFETY CODE § 534.008(a) ................................................ 10

TEX HEALTH & SAFETY CODE § 534.008(b) ............................................... 10

# I.
## Summary

This is a section 1983 lawsuit alleging the Burke Center ("the Center"), a local governmental mental health and intellectual disabilities center, violated Jonathan Chapman's ("Jonathan") constitutional rights when he died while residing at a group home operated by the Center.  More specifically, in the First Amended Complaint ("FAC"), his father Frank Chapman ("Chapman") brings a wrongful death action individually and a survival action as heir to Jonathan's estate, contending the Center violated Jonathan's purported Fourteenth Amendment and Fourth Amendment "rights to reasonably safe conditions, to be free from undue restraint, to adequate medical care, and to protection from harm."[1] Chapman alleges that Jennie Weisinger, the Center employee on duty at the group home at the time of Jonathan's death, was constitutionally negligent in, *inter alia*, failing to seek hospitalization for Jonathan when his vital signs indicated emergency medical treatment was required. Chapman asserts the Center was deliberately indifferent to an alleged need for better training of its group home employees like Weisinger and, thus, is constitutionally responsible for Jonathan's death.

---

[1]     First Amended Complaint ¶ 16 (hereinafter "FAC").

Chapman's claims against the Center fail for two reasons. First, assuming the purported constitutional rights outlined in the FAC applied in Jonathan's favor, the FAC fails to plausibly plead a policy or custom attributable to the Center's policymakers that caused Jonathan's injuries. Identifying no official policy endorsing inadequate training, Chapman relies, instead, on a supposed widespread "custom" of being deliberately indifferent to having "appropriately trained staff in place to provide attention to its wards and that resulted in a complete failure to provide reasonably safe conditions, to keep [Jonathan] from undue restraint, to provide adequate medical care to [Jonathan], and to protect [Jonathan] from harm."[2] However, not only does Chapman fail to plead any factual content supporting the proposition that the Center's policymakers were deliberately indifferent to a need for training (or that there even *was* a need for training), but the evidence incorporated into the FAC – namely, the Adult Protective Services Abuse and Neglect Investigative Report – establishes the contrary: that Jennie Weisinger was fully trained to manage Jonathan's needs.

Second, even if Chapman had plausibly pleaded a custom attributable to the Center's policymakers that caused Jonathan's death, the Constitution does not apply the "rights" Chapman identifies in Jonathan's favor. The U.S. Supreme Court has recognized similar "rights" in favor of the *involuntarily committed*; but it

---

[2]     FAC ¶ 17.

has never extended them to persons who reside voluntarily in a government-operated group home. At bottom, Chapman's claims fail on the pleadings as a matter of law.

## II.
## Statement of Issues

In accordance with Local Rule CV-7(1), the Center asserts these are the issues that must be decided:

1. Whether Chapman fails to state a claim against the Center under section 1983 because he fails to plead sufficient facts plausibly identifying (1) an official policy or custom, (b) legally attributable to the Center's policymaker (the Board of Trustees), that (c) was the moving force behind the alleged violation of Jonathan's constitutional rights?

2. Alternatively, whether the U.S. Constitution recognizes the constitutional rights pleaded by Chapman in favor of persons who reside voluntarily in a government-operated group home for the intellectually disabled?

## III.
## Factual Allegations

*By summarizing and restating the factual allegations contained in the FAC, the Center does not endorse any of them as being accurate. They are referenced here only for purposes of providing the contextual framework for this Motion to Dismiss.*

Jonathan was a mentally disabled 43-year-old male diagnosed with moderate intellectual disabilities, hypothyroidism, impulse control disorder, and

morbid obesity.[3] He was 5'6" tall and weighed 335 pounds.[4] Jonathan was enrolled in the Texas Health and Human Services Commission's Home and Community-Based Services (HCS) Medicaid Waiver Program.[5] Though the FAC does not describe the HCS Waiver Program, the program is a joint federal-state funded scheme that uses Medicaid funds to provide services and support to Texans with an intellectual disability so that they can live in the community – as opposed to a large, state-run institution. Before the creation of Medicaid waiver programs, intellectually disabled persons had to live in institutional settings like State Supported Living Centers before Medicaid would pay for long-term services. They are named "waiver programs" because certain Medicaid requirements are waived (meaning they do not apply) and this enables families to more easily access Medicaid funds to provide support to intellectually disabled family members that want to live in a community setting, such as a group home, and not in an institution.[6]

According to the FAC, Jonathan lived with his parents "until his mother became sick with cancer and needed chemotherapy treatments, at which time he

---

[3]   FAC ¶¶ 7-8.

[4]   FAC ¶ 8.

[5]   FAC ¶ 8.

[6]   For a general discussion of the Medicaid HCS Waiver Program, see https://www.hhs.texas.gov/providers/long-term-care-providers/home-community-based-services-hcs and https://www.navigatelifetexas.org/en/insurance-financial-help/texas-medicaid-waiver-programs-for-children-with-disabilities .

became a resident of the Burke Center" where he resided at a Center-managed residential-style group home known as "Cherry House."[7] Notably, the FAC does *not* allege that Jonathan had been *involuntarily* committed to the home. Other than stating that he "became a resident" when his mother became ill, the FAC is silent on how Jonathan came to reside at Cherry House.  This is because Jonathan was at Cherry House *voluntarily* through a decision made by his family. Again, the FAC does *not* allege that Jonathan was unable to leave Cherry House voluntarily if his family desired him to live at a different location. This is, of course, because he was able to leave if his family desired to move him.  Importantly, HCS Waiver Program group homes are not limited to being government-owned and operated. Most HCS Waiver Program group homes in Texas are operated by private (either non-profit or for-profit) organizations. It just so happened that Jonathan was residing in a group home operated by the Center, a local governmental entity.

In the FAC, Chapman alleges that Jonathan had tested positive for COVID in late June 2022 and twice been seen at a local hospital when he had difficulty breathing while residing at Cherry House.[8] After his second hospital visit, he

---

[7]     FAC ¶¶ 8-9.

[8]     FAC ¶ 9.

returned to Cherry House and was in residence on the day of his death – July 2, 2022.[9]  Center employee Jennie Weisinger was on duty at the home that day.

To describe the circumstances surrounding Jonathan's death, the FAC quotes liberally from the Texas Department of Family and Protective Services (Adult Protective Services) Abuse and Neglect Investigation Report prepared after the state's investigation of Jonathan's death ("the APS Report").[10] Those portions of the FAC will not be repeated here, but because the APS Report is liberally quoted and summarized in the FAC and is indisputably central to Chapman's claim, the Center is supplying a copy of the APS Report with this Motion to Dismiss.[11]

Citing the APS Report, the FAC concludes that Jonathan died from "aspirating in his own vomit" and that Weisinger was found to have neglected Jonathan.[12]

---

[9]      FAC ¶ 9.

[10]     FAC ¶¶ 10, 11, and 14.

[11]     *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 294 F.3d 285, 288 (5th Cir. 2004) (the district court may consider documents the defendant attaches to the motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim."); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). The APS Report is attached as Exhibit A to the Motion to Seal the report filed simultaneously with this Motion to Dismiss.

[12]     FAC ¶¶ 12-13.

The remainder of the FAC is largely a cacophony of legal buzzwords and broad conclusory allegations that will not be repeated here because they provide little, if any, additional factual context relevant to the Motion to Dismiss.

## IV.
## Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[13] Additionally, Rule 12(b)(6) authorizes the dismissal of a complaint for "failure to state a claim upon which relief can be granted."[14] In reviewing a motion to dismiss, the court must accept "all well-pleaded facts as true" and view those facts "in the light most favorable to the plaintiffs."[15] While the complaint "does not need detailed factual allegations," it must adequately provide the plaintiffs' grounds for entitlement to relief—"including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"[16] In other words, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its

---

[13]     Fed. R. Civ. P. 8(a)(2).

[14]     FED. R. CIV. P. 12(b)(6).

[15]     *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc)).

[16]     *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

face.'"[17] A "formulaic recitation of the elements of a cause of action" or "facts [that] do not permit the court to infer more than the mere possibility of misconduct" fail to satisfy the pleading requirements of Federal Rule of Civil Procedure 8(a).[18] Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief'" and must be dismissed.[19] And where the plaintiffs purport to assert claims pursuant to 42 U.S.C. § 1983 – as they have here – "the complaint 'must state *specific facts,* not simply legal and constitutional conclusions.'"[20]

## V.
## Argument and Authorities

### A.    Governmental entity liability under 42 U.S.C. § 1983.

Section 1983 provides a civil cause of action in favor of anyone whose constitutional rights have been violated by a "person" acting under color of state law.[21] In *Monell v. Department of Social Services*, the U.S. Supreme Court held that a local governmental unit is a "person" within the meaning of section 1983 and, accordingly, can be sued under the statute.[22] This action is limited, however, to

---

[17]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)).

[18]  *Ashcroft*, 556 U.S. at 678-79.

[19]  *Id.*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

[20]  *Berry v. Texas Woman's Univ.*, 528 F. Supp. 3d 579, 595 (E.D. Tex. 2021) (quoting *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990)).

[21]  42 U.S.C. § 1983.

[22]  436 U.S. 658, 690 (1978).

instances where the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or a "governmental 'custom' even though such custom has not received formal approval through the body's official decision-making channels."[23] The government cannot be held liable simply because it employs a tortfeasor.[24] In other words, the doctrine of vicarious liability for an employee's actions has no vitality under section 1983.[25]

In practice, this creates a demanding standard for pleading and, if necessary, proving entity liability under section 1983. A section 1983 plaintiff must identify and allege "'(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom.'"[26]

## B.   Chapman fails to adequately plead that a policy or custom attributable to the Center's policymakers caused Jonathan's injuries.

According to the FAC, "the Burke Center had a custom and persistent and widespread practice of not having appropriately trained staff in place to provide attention to its wards and that resulted in the complete failure to provide

---

[23]     *Id.* at 690-691.

[24]     *Id.* at 691.

[25]     *Id.*

[26]     *Valle v. City of Houston*, 613 F.3d 536, 541-541 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

reasonably safe conditions, to keep Mr. Chapman free from undue restraint, to provide adequate medical care to Mr. Chapman, and to protect Mr. Chapman from harm."[27]  Given that Jonathan *voluntarily* resided at Cherry House (and was never prohibited from leaving), whether the Constitution would recognize these "rights" in his favor is unlikely.  In any event, for purposes of argument, the Center will assume their existence. But even if these "rights" accrued to Chapman, the FAC is woefully insufficient to impose section 1983 liability on the Center.

"An 'official policy' may take two forms—either a 'policy statement formally announced by an official policymaker' or a 'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'"[28] Under Texas law, the Center's official policymaker is its Board of Trustees.[29]  Chapman does not allege the Board of Trustees implemented a formal policy of using untrained staff at the Cherry House (or any other Center facility). Instead, Chapman contends the Center had a "custom" of using untrained staff and, accordingly, was deliberately indifferent to

---

[27]    FAC ¶ 17.

[28]    *Brown v. Tarrant County, Texas*, 985 F.3d 489, 497 (5th Cir. 2021) (quoting *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010)).

[29]    *See* TEX. HEALTH & SAFETY CODE § 534.008(a) ("The board of trustees is responsible for the effective administration of the community center.") and TEX. HEALTH & SAFETY CODE § 534.008(b) ("The board of trustees shall make policies that are consistent with the applicable rules and standards of each appropriate department.").

the medical needs of its residents.[30]   In essence, Chapman asserts a "failure to train" theory of section 1983 liability.  As the U.S. Supreme Court has recognized:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of section 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.[31]

Indeed, to satisfy this standard, the government's failure to train its employees "in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"[32]

To survive a motion to dismiss, "[t]he description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain *specific facts*."[33] This means that, in the context of pleading "deliberate indifference," a "'pattern of similar constitutional violations by untrained employees is ordinarily' required[.]"[34] Accordingly, the Fifth Circuit has repeatedly held that, to survive dismissal, plaintiffs must plead factual content reflecting similar incidents sufficient to give the government notice that its training

---

[30]     FAC ¶ 17, ¶ 26.

[31]     *Connick v. Thompson*, 563 U.S. 54, 61 (2011).

[32]     *Id*. (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[33]     *Spiller v. City of Texas City, Texas*, 130 F.3d 162, 167 (5th Cir. 1997) (emphasis added).

[34]     *Pena v. City of Rio Grande*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Connick*, 563 U.S. at 62)).

program is inadequate.[35] For example, in *Verastique v. City of Dallas*, the Fifth Circuit recently affirmed the 12(b)(6) dismissal of a section 1983 claim against the City even though plaintiff identified nineteen instances where the defendant police officer had been investigated for excessive force.[36] The court found that numerous of the incidents were "devoid of critical factual enhancement" and were insufficient to demonstrate a pattern of alleged misconduct like that alleged in the complaint.[37]  As the court summarized, "the nineteen incidents are not sufficiently similar, specific, or numerous" to plausibly support the proposition that the City was deliberately indifferent to the officer's conduct.[38]

Chapman's complaint is much weaker than those the Fifth Circuit has repeatedly rejected. Chapman pleads "[o]n information and belief, the Burke Center had a custom and widespread practice of not having appropriately trained staff in place to provide attention to its wards and that resulted in the complete failure to provide reasonably safe conditions, to keep Mr. Chapman free from undue restraint, to provide adequate medical care to Mr. Chapman, and to protect

---

[35]     *See, e.g., Pena*, 879 F.3d at 623 (affirming 12(b)(6) dismissal where plaintiff failed to plead factual content supporting a pattern of violations); *Johnson v. Harris County*, 83 F.4th 941, 946 (5th Cir. 2023) (same); *Verastique v. City of Dallas*, 106 F.4th 427, 434 (5th 2024) (same).

[36]     *Verastique*, 106 F.4th at 433-434.

[37]     *Id.*

[38]     *Id.*

Mr. Chapman from harm."[39] According to the complaint, "on information and belief, there had been prior incidents and investigations into the Burke Center, known to the administrators, but that the administrators chose to maintain the customs despite the danger posed to its residents and wards by lack of supervision and qualified staff."[40]  But *when* were these incidents?  *Who* committed them?  *Where* were they committed (at Cherry House or some other facility)?  And most importantly, *how* were they like the Chapman incident?  We do not know. And without meaningful factual content, it is impossible to demonstrate that these other alleged incidents represent a "widespread" practice of constitutional violations – like those allegedly suffered by Chapman – that would put the Board of Trustees on notice that its training program was inadequate.  As the Fifth Circuit stated in *Peterson v. City of Fort Worth*:

> Where prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." It is thus clear that a plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case." A pattern requires similarity and specificity; "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." A pattern also requires "sufficiently numerous prior incidents," as opposed to "isolated instances."[41]

---

[39]     FAC ¶ 17.

[40]     *Id.*

[41]     588 F.3d 838, 850-851 (5th Cir. 2009) (citations omitted).

Chapman provides no factual content supporting his conclusory allegation that there were "prior incidents" involving the Center's group home staff sufficient to give the Board of Trustees notice the Center's training program was lacking. In other words, the complaint fails to plead facts that support deliberate indifference and, because of that, fails the "policy or custom" test as a matter of law.

Not only does Chapman fail to plead facts that would plausibly establish the Board of Trustees was deliberately indifferent to an alleged need for training, but those facts he does incorporate into the complaint compel the opposite conclusion:  that Weisinger was consistently trained on how to manage, and medically care for, residents at the Cherry House. The FAC quotes liberally from the Texas Department of Family and Protective Services (Adult Protective Services) Abuse and Neglect Investigative Report conducted after Jonathan Chapman's death ("the APS Report").[42] Indeed, the FAC fully incorporates the entire transcript of the interaction between Weisinger and Chapman contained in the APS Report, summarizes portions of Weisinger's interview with the APS investigator, and incorporates the APS determination that Weisinger neglected Chapman.[43] What Chapman *fails* to include, however, is the APS Report's findings

---

[42]     *See* FAC ¶¶ 10, 11, and 13.

[43]     *Id.*

that Weisinger was fully and consistently trained by the Center on the medical

needs of group home residents and particularly Jonathan Chapman's medical

needs. In reviewing a motion to dismiss, the district court may consider

documents the defendant attaches to the motion to dismiss "if they are referred to

in the plaintiff's complaint and are central to her claim."[44] The Center has

submitted the full APS Report contemporaneously with this Motion. Careful study

of the report reveals that APS thoroughly reviewed Weisinger's training as part of

its investigation and determined:

- Weisinger was regularly trained on basic healthcare.

  **Training Transcript:** Shows that Ms. Weisinger received training in
  Detecting and Reporting Abuse (online) and Healthcare (online) every year
  from 2015-2022.  She also completed First Aid Verification in 2015, 2017,
  2019, and 2021.  Transcript shows that Ms. Weisinger received the training
  in Basic Healthcare and Training (not completed online) discussed by RN
  Myeshia Salter every year from 2015 through 2022.  She last received
  refresher training in this area on 4/19/22.[45]

  **Basic Healthcare Curriculum:** Shows that staff are trained initially and then
  annually thereafter on basic healthcare through the "Basic Healthcare and
  Medication Training" provided by an RN or LVN.  Staff are to follow the
  guidelines for minor/acute illness, which instructs staff to notify the nurse
  if any symptoms persist and to call 911 and then notify the nurse when the
  individual appears to be in significant distress.  Basic healthcare guidelines
  address the most frequently encountered symptoms of illness to assist staff
  in making decisions about when to contact the on-call nurse regarding non-
  emergency situations.  These guidelines should be used for those periods
  when the client needs medical attention not requiring hands-on assessment
  by a nurse or physician.  These guidelines specifically address vomiting.  If

---

[44]     *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 294 F.3d 285, 288 (5th Cir. 2004); *see also Dorsey v. Portfolio
Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

[45]     APS Report 20 and Training Transcript (Exhibit K to APS Report).

continuous vomiting persists for more than one hour or more despite nothing by mouth, staff are instructed to call the on-call nurse. The curriculum also specifically addresses nurses being notified by phone.[46]

- Weisinger was trained on how to address situations (like Jonathan's) where a resident's oxygen levels dropped precipitously low:

  **Vital Signs Refresher Training and Signature Sheet:**  Dated 4/19/22; signed by Jennie Weisinger; shows that Ms. Weisinger was trained that normal oxygen level should be greater than 95%, and nursing must be notified immediately of readings less than 90%.  Staff should call 911 immediately for acute troubling breathing or cyanosis.[47]

- Finally, Weisinger signed a nursing memorandum *specific* to Jonathan Chapman, just a few days before his death identifying vital signs to monitor and steps to take if those signs fell precipitously low:

  **Nursing Memorandum:**  Signed by Jennie Weisinger on 6/27/22; shows that Ms. Weisinger knew or should have known that she should contact emergency services when Mr. Chapman's oxygen level dropped below 90% as this document instructs staff to monitor blood pressure, temperature, and oxygen level three times per day while awake and specifically instructs staff to send Mr. Chapman to the hospital if oxygen level drops below 90% or temperature goes above 101.[48]

Significantly, APS made no findings that the Center's training was inadequate or that Jonathan's death was anything other than an isolated incident. Chapman's contention that the Center was "deliberately indifferent" to Jonathan's purported

---

[46]     APS Report 20 and Basic Healthcare Curriculum (Exhibit L to APS Report).

[47]     APS Report 20 and Vital Sign Monitoring Refresher Training (Exhibit M to APS Report).

[48]     APS Report 20-21 and 6/28/22 Nursing Memorandum (Exhibit N to APS Report).

constitutional rights by failing to train Weisinger simply cannot stand in the face of the record.

At bottom, the FAC is nothing more than an effort to impose vicarious liability on the Center for Weisinger's alleged negligence.  Indeed, the complaint itself makes this clear: "[a]t all relevant times, the Burke Center was *vicariously liable* for the acts and omission of its employee Ms. Weisinger."[49] Section 1983, however, flatly forecloses imposing vicarious liability on the government for the actions of its employees.[50] Because the FAC fails to plausibly identify a Center policy or custom that was the moving force behind the alleged violation of Jonathan Chapman's constitutional rights, Chapman's claims against the Center must be dismissed.

## C.   Alternatively, Chapman fails to adequately plead an underlying constitutional violation.

The constitutional "right" at issue is unclear.  Chapman pleads that Jonathan's "rights recognized in case law and secured to him through the Due Process Clause of the Fourteenth Amendment and Fourth Amendment, including

---

[49]     FAC ¶ 27 (emphasis added); *see also* FAC ¶ 14 ("At all material times, Ms. Weisinger was *acting in the course and scope of her employment* as Direct Care Staff for the Burke Center.") (emphasis added); FAC ¶ 17 ("Thus, the Burke Center, *by and through its employees and Ms. Weisinger*: (1) created a custom and allowed a custom under which unconstitutional practices occurred[.]") (emphasis added); FAC ¶ 25 ("The Burke Center, *through its employees*, violated Mr. Chapman's civil rights[.]") (emphasis added).

[50]     *Monell*, 436 U.S. at 691.

the rights to reasonably safe conditions, to be free from undue restraint, to adequate medical care, and to protection from harm" were violated.[51] The Fourth Amendment prohibits government law enforcement from conducting "unreasonable searches and seizures" and imposes a "probable cause" requirement on court-issued warrants.[52] It would seem to have no application here or, at least, there is no factual content in the FAC that would support its invocation. Accordingly, it may be dispensed with quickly. The Due Process Clause of the Fourteenth Amendment, however, requires more scrutiny and, indeed, the FAC contains an explicit reference to the U.S. Supreme Court's 1982 opinion in *Youngberg v. Romeo*, where the Court addressed the application of the Due Process Clause to mentally retarded persons who have been <u>*involuntarily*</u> <u>*committed*</u> to a state institution.[53]

In *Youngberg*, the Supreme Court addressed whether a person, "involuntarily committed to a state institution for the mentally retarded, has substantive rights under the Due Process Clause of the Fourteenth Amendment to (i) safe conditions of confinement; (ii) freedom from bodily restraints; and (iii)

---

[51] FAC ¶ 16.

[52] U.S. CONST. amend. IV ("The right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

[53] FAC ¶ 29.

training or 'habilitation.'"[54] The plaintiff was a "profoundly retarded" man whose mother convinced a state court to commit him to a state institution under the "applicable involuntary commitment provision of the Pennsylvania Mental Health and Mental Retardation Act[.]"[55] While institutionalized, the plaintiff became injured on numerous occasions, both through his own acts and the acts of other residents.[56] He was later transferred to the institution's hospital where he was "physically restrained" during portions of the day to protect him from himself and to protect others that were in the hospital.[57] The plaintiff sued alleging that officials knew, or should have known, that plaintiff "was suffering injuries and that they failed to institute appropriate preventive procedures" and, thus, violated his Fourteenth Amendment "rights."[58] The plaintiff also contended the Fourteenth Amendment provided him with a right to "freedom of movement" and a program of "training" or "habilitation" that would make him less likely to suffer injury. As the Supreme Court summarized the Fourteenth Amendment claims, "we must decide whether liberty interests . . . exist in safety, freedom of movement, and

---

[54]     457 U.S. 307, 309 (1982).

[55]     *Id*. at 309-310.

[56]     *Id*. at 310.

[57]     *Id*. at 310-311.

[58]     *Id*. at 310.  The plaintiff also asserted an Eight Amendment claim, but this claim was rejected by the U.S. Court of Appeals for the Third Circuit and not addressed by the Supreme Court.

training."[59] Pivotal to the Court's analysis was the fact that plaintiff had been "involuntarily committed" to a state institution.[60] Concluding that "if it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions," and, thus, the Court recognized that the Constitution provided a right to the involuntarily committed not to be held in "unsafe conditions."[61] Likewise, the Court held that if incarcerated criminals had a right to "freedom from bodily restraint," then this interest "must also survive involuntary commitment."[62] The final asserted "right" – a "constitutional right to minimally adequate habilitation" – was more difficult to analyze based on the record before the Court. In any event, it concluded that, based on the record developed to that point, that plaintiff's "liberty interests require the State to provide minimally adequate or reasonable training [to the involuntarily committed person] to ensure safety and freedom from undue restraint."[63] In summary, the Court held in *Youngberg* that intellectually disabled persons involuntarily committed to a state institution have, generically speaking,

---

[59]     457 U.S. at 315.

[60]     *Id*. at 314 ("We consider here for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution.").

[61]     *Id*. at 315.

[62]     *Id*. at 316.

[63]     *Id*. at 319.

substantive Due Process rights to (1) not be held in "unsafe conditions," (2) not be subjected to unnecessary "bodily restraint," and (3) to minimally adequate "training" that will help them avoid injury and undue restraint.

Chapman does not contend that Jonathan was not provided with sufficient "training," but he does assert Jonathan had a right to "reasonably safe conditions" and "to be free from undue restraint."[64] Presumably this legal boilerplate is an effort to bring his claims under *Youngberg*'s umbrella. But whether *Youngberg* and its progeny (specifically *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)) extend to persons who voluntarily reside in a residential home that just happens to be owned by the government is questionable. In *Walton v. Alexander*, the Fifth Circuit addressed whether the rights described in *Youngberg* and *DeShaney* extended to protect a deaf child voluntarily attending the Mississippi School for the Deaf from injury by another student.[65] In *Walton*, the plaintiff voluntarily chose to attend the state-operated school for the deaf even though there were private deaf institutions available.[66] Once choosing to attend the state institution, however, the students "were under the twenty-four hour custody of the School and subjected to strict rules concerning what they were allowed to do

---

[64]   FAC ¶ 16.

[65]   44 F.3d 1297 (5th Cir. 1995).

[66]   *Id*. at 1299 ("Deaf children were free to attend either a public or private facility located in Mississippi.").

and when they could come and go."[67] While in attendance, the plaintiff was repeatedly sexually assaulted by a classmate.[68] Recognizing that his attendance was voluntary, plaintiff – like Chapman[69]– argued that he nevertheless stood in a "special relationship" with the school that imposed "similar restraints of personal liberty, as those held involuntarily, such as prisoners and involuntarily committed mental patients."[70] Sitting en banc, the Fifth Circuit rejected this argument. As it stated:

> Since *DeShaney* was decided by the Supreme Court, we have followed its language strictly and have held consistently that only when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against his will* does a 'special relationship' exist between the individual and the state.[71]

Thus, because the plaintiff "attended the school through his own free will (or that of his parents) without any coercion by the state," the Fourteenth Amendment did not apply in his favor.[72] As the court found:

> Although Walton's freedom was curtailed, it was he who voluntarily subjected himself to the rules and supervision of the School officials. Walton's willful relinquishment of a small fraction of liberty simply is not comparable to that measure of almost total deprivation experienced by a prisoner or involuntarily committed mental patient.

---

[67]    *Id.*

[68]    *Id.* at 1299-1300.

[69]    FAC ¶ 16 ("At all times, a special relationship existed between Mr. Chapman and the Burke Center and Ms. Weisinger.").

[70]    *Walton*, F.3d at 1300.

[71]    *Id.* at 1304 (emphasis in original).

[72]    *Id.* at 1305.

> Nor do the facts establish that the state, through its affirmative acts, held Walton at the School involuntarily and against his will.  To the contrary, the record shows that Walton attended this school voluntarily with the option of leaving at will, an option that was never withdrawn.[73]

Chapman's claim fails for the same reason. Chapman does not plead that Jonathan was involuntarily committed to the Cherry House. This is because he was not. Jonathan's family voluntarily placed him there – one of several options (both public and private) available. Jonathan was never prohibited from moving to a different home if that is what his family desired. Due to his mental and physical limitations, Jonathan was indisputably reliant on the Center's staff to help him meet his most basic personal needs, including the need for medical care. The Center does not deny this fact. But this reality, in and of itself, does not give rise to a _constitutional_ right in Jonathan's favor. Certainly, state tort law could be implicated, but the Due Process Clause is not "a font of tort law to be superimposed upon whatever systems may already be administered by the states."[74] In summary, as a matter of law, the FAC does not plead sufficient factual content that would establish a substantive Due Process right "to reasonably safe conditions, to be free from

---

[73]    *Id.*

[74]    *Paul v. Davis*, 424 U.S. 693, 701 (1977).

undue restraint, to adequate medical care, and to protection from harm"[75]

in Jonathan's favor. Thus, Chapman's section 1983 claim against the Center

should be dismissed.

## VI.
## Prayer

WHEREFORE, PREMISES CONSIDERED, Defendant Burke Center asks the

Court to dismiss all of Plaintiff's claims against it for the failure to state a claim

upon which relief may be granted.

Respectfully submitted,

/s/ Joel E. Geary
Joel E. Geary
State Bar No. 24002129
jgeary@wslawpc.com
James M. Welch
State Bar No. 00785210
jwelch@wslawpc.com
WADDELL SERAFINO GEARY
    RECHNER JENEVEIN, P.C.
1717 Main Street, Suite 2500
Dallas, Texas 75201
Dallas, Texas 75201
214/979-7400 telephone
214/979-7402 facsimile

---

[75]      FAC ¶ 16

Wayne D. Haglund
State Bar No. 08697500
whaglund@haglundlaw.com
Wayne Douglas Haglund
   Law Office, P.C.
107 W. Kerr Avenue
Lufkin, Texas 75904
936/639-0007 Telephone
936/639-0016 Facsimile

*Attorneys for Defendant Burke Center*

## Certificate of Service

I certify that a true and correct copy of the above and foregoing instrument has been served upon all counsel of record via CM/ECF, on this the 26th day of August, 2024.

*/s/ Joel E. Geary*
_____
Joel E. Geary